126 Cal.Rptr.2d 97 (2002)
102 Cal.App.4th 1062
Genoveva ROJAS et al., Petitioners,
v.
Los Angeles County SUPERIOR COURT, Respondent.
Julie Coffin, et al., Real Parties in Interest.
No. B158391.
Court of Appeal, Second District, Division Seven.
October 10, 2002.
Review Granted January 15, 2003.
*99 Agnew & Brusavich, Bruce M. Brusavich, Leonor C. Gonzales, Los Angeles, Vibhu Talwar; Lewis, Martenstine, Wicke & Sherwin, Thomas L. Hoegh, Woodland Hills; Esner & Chang, Andrew N. Chang, Diamond Bar, Stuart B. Esner, Los Angeles, for Petitioners.
*100 Watten, Disco & Bassett, Robert C. Risbrough, Santa Ana, for Real Parties In Interest Julie Coffin, Trustee of the 1979 Ehrlich Investment Trust and Richard Ehrlich.
Friedenthal, Cox & Herskovitz, Carlos Cabral, for Real Party In Interest Deco Construction Co.
Veatch, Carlson, Grogan & Nelson, Kevin H. Louth, Steven W. Sedach, Los Angeles, and Bernhard E. Birh, for Real Party In Interest GES Roofing.
*98 LILLIE, P.J.
In this writ proceeding, we address whether the mediation privilege of Evidence Code sections 1119 and 1120 applies to raw data or "non-derivative" evidentiary material. Petitioners sought production and inspection of material produced by real parties in connection with a mediation held in prior litigation to which petitioners were not parties. The materials sought included raw data as well as a compilation of data prepared for the mediation. Pursuant to the mediation privilege of Evidence Code section 1119, the trial court held all material was protected from production. Petitioners seek a writ of mandate directing the trial court to vacate its order and enter a new and different order compelling production of the materials. We conclude the mediation privilege does not apply to factual material and only provides qualified protection for amalgamated materials.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

1. The Underlying Action and the Mediation.

Petitioners are the tenants of an apartment complex located at 131, 141, and 171 So. Burlington Street (Apartment Complex) owned by real parties in interest Julie Coffin, Trustee of the 1979 Erhlich Investment Trust and Richard Ehrlich (collectively Coffin). The Apartment Complex was built by KSF Holdings, First City Properties, Inc., Fields & Silverman, and various other contractor and subcontractor entities (collectively Developers). Coffin became the owner of the building in 1994, and in December 1996, Coffin commenced an action against the Developers alleging numerous construction defects that had resulted in water leakage, in turn causing the presence of toxic molds and other microbes on the property. The construction defects included problems with the plumbing, electrical, and ventilation systems.
In connection with the underlying action, the parties entered into a Case Management Order (CMO). The CMO provided that a special master would be appointed to oversee discovery; discovery would be stayed; specified documents would be deposited into and held at a document repository; Coffin would prepare a defect list; the Developers would be permitted to conduct destructive testing; the matter would be submitted to mediation; and the parties' experts would meet to discuss the cost and scope of repair. The final defect list was required to contain the type, extent and location of defects, Coffin's contentions as to the cause of the defect, whether the defect was identified by visual inspection, invasive testing, extrapolation, or some other method, and a repair report setting forth in detail the necessary repairs and specific cost of each repair.[1]
In April 1997, Coffin prepared a preliminary defect list, which identified defects in *101 the structure of the Apartment Complex as well as mold infestation. In April 1998, Coffin began air testing at the Apartment Complex. Sometime in late 1998, one of the buildings (171 So. Burlington Avenue) at the Apartment Complex was closed, and some of those tenants moved into the other two buildings. Fences were placed around the building, which remained closed until abatement efforts were completed. Those abatement efforts included demolition of drywall and ceilings in all of the buildings and the installation of replacement drywall. Antimicrobial agents were also applied, and plumbing was repaired.
In April 1999, the underlying litigation settled. The settlement provided that "[t]he terms of this agreement shall remain confidential as between the parties, their counsel, their consultants and their insurance carriers and their representatives. All parties, their counsel, insurance company representatives and consultants shall not take any action to facilitate, propagate and otherwise participate in the solicitation or prosecution of any claims by any tenant, current or future, with regard to their occupancy of the property. In addition, throughout this resolution of the matter, consultants provided defect reports, repair reports, and photographs for informational purpose which are protected by the Case Management Order and Evidence Code §§ 1119 and 1152, and it is hereby agreed that such materials and information contained therein shall not be published or disclosed in any way without the prior consent of plaintiff or by court order."

2. The Instant Action and the Motions to Compel,

In August 1999, petitioners, many of whom are children, commenced the instant action against Coffin and the Developers of the Apartment Complex.[2] Petitioners contended that faulty plumbing, roofing, HVAC (heating, ventilation, and air conditioning), sheet metal and stucco work caused free water to circulate in the building, permitting microbes to infest the building. As a result, petitioners suffered numerous health problems. Petitioners alleged that they did not become aware of the building defects until April 1999, and alleged that Coffin and the Developers conspired to conceal the defects and microbe infestation from them.

a. First Motion to Compel, July 27, 2000.

In November 1999, petitioners served a request for production of documents, in which petitioners sought production of, among other things, five self-described categories that included: (1) all discovery and responses exchanged between the parties to the underlying litigation; (2) "[a]ll actual physical evidence evidencing the condition of the buildings, including, without limitation, photographs, videotapes, test samples, test reports (such as spore and colony counts), and any physical evidence that was removed from the buildings and saved (drywall, plumbing, framing members, etc.)"; (3) writings describing the buildings, including written notes of observations made during building inspections, and witness interviews"[t]his category would also include notes describing what the witnesses did and saw while conducting *102 inspections or repairs of the buildings;" (4) and (5) writings evidencing the opinions of expert consultants, both those communicated to the defendants and those not communicated to the defendants.
In July 2000, petitioners brought a motion to compel production of documents, heard before Judge McCoy. Petitioners argued that purely evidentiary, or "non-derivative" material, was not protected by work product. They contended that such material included the identity and location of physical evidence, and the identity and location of witnesses with knowledge of the facts of the case. "Derivative" materials, which contained attorney interpretations or evaluations of the facts or law, were discoverable upon a showing of good cause, which existed in the instant case because there was no other means by which to obtain the requested discovery because Coffin had remediated the property. Petitioners sought all pleadings, discovery responses, photographs, samples, test results, correspondence, and documents identifying potential witnesses. Petitioners contended that because of the remediation of the property, there was no other way they could obtain the information.
Judge McCoy issued a statement of decision in which he ordered documents produced for an in camera inspection. Coffin took the position that all documents had been prepared for the mediation and were therefore protected by the mediation privilege. The in camera inspection, conducted November 3, 2000, was held only in the presence of defense counsel, and the court ordered the transcript sealed.[3] After petitioners pointed out they could not effectively challenge the court's ruling without a privilege log, the court directed that one be prepared, and Coffin submitted a privilege log.
On January 24, 2001, the court ordered that documents submitted in compilation form for the mediation were privileged. In particular, the court stated that "the court's rulings only apply to the privileged nature of the compilations. The documents attached to the compilations were not submitted to the court separately, and the court ruled on the documents taken together for mediation purposes."[4]

b. Second Motion to Compel, March 7, 2002.

After reassignment of the matter to Judge Mohr, petitioners moved to compel the production of physical evidence, including photographs of the project, former tenants, and current tenants, including photographs provided in the underlying action as part of compilations. Petitioners also requested videotapes of the project and videotapes of former and current tenants, including videotapes of the "project that were utilized" "during the mediation." Lastly, petitioners sought "any and all raw data regarding air sampling for mold spores," raw data from "bulk sampling for mold spores," raw data from destructive *103 testing, "any and all results" from destructive testing, and all recorded statements of former and current tenants. Petitioners contended Judge McCoy's ruling supported their argument that photographs and other raw material was not protected by the mediation privilege because Judge McCoy had not ruled on individual photographs or other evidentiary material.
Coffin opposed the motion on the grounds that the photographs and other raw evidence was prepared "for the purpose of mediation" and that in the absence of mediation confidentiality, they would not have produced the material, including the photographs and other raw data in the mediation binder. They relied on the CMO in the underlying litigation, in which "any document prepared for the purpose of mediation" was protected. Furthermore, the mediation privilege did not support any distinction between documents or material that were part of a compilation and those which were not. Coffin also contended that Judge McCoy had concluded certain individual items were not producible because he had individually reviewed such items at the in camera proceedings.
Petitioners responded[5] that the changed conditions of the premises due to remediation, and their inability therefor to replicate the raw data and images recorded in the photographs, constituted good cause for the production of the materials sought. They pointed out that mold spore analyses did not constitute, without more, expert opinion; that photographs do not contain attorney opinion, impression or analysis; and that the court's prior order mandated disclosure.
At the hearing, the court indicated it was troubled by applying the mediation privilege to raw evidence. The court stated that "those photographs trouble me because ... this is not a summary of impressions of an expert or anything.... This is just ... a representation, fixed representation ... of the state of a particular place a particular time, and if there's really no other way for the plaintiff to get itI have a concern [that] the mediation and litigation privilege were not meant as a device or subterfuge to block evidence." Coffin argued that the photographs were "advocacy" in the sense that were taken to show impressions, and have arrows pointing out significant features. They also argued that the photographs were not just a mere group of photographs; rather, they constituted a report of their experts, and because a photograph was "worth a thousand words" the photographs were more than just raw evidence. The court pointed out that you "can't just put a piece of evidence in a mediation and make it disappear." Coffin argued that the photographs were taken for the purposes of mediation and had only been taken because of the CMO. Furthermore, particular photographs were taken because they were meant to depict a defect.

DISCUSSION

MEDIATION CONFIDENTIALITY DOES NOT PROTECT RAW PHYSICAL EVIDENCE FROM DISCOVERY.
Petitioners argue that the mediation confidentiality provisions of Evidence Code sections 1115,[6] et seq. do not shield physical evidence, such as photographs and raw test data, from discovery because such evidence is purely evidentiary in nature ("non-derivative"). They contend such evidence *104 is therefore "clearly otherwise admissible," pursuant to the provisions of section 1120, and at the very least, any evidence prepared prior to the CMO, which commenced the mediation process, should be discoverable. Petitioners point out that they have no other means by which to obtain any of this evidence, as most of it was destroyed or removed from the premises as a result of the remediation process.
Coffin[7] contends that the statutory language of section 1119 is plain, and there is no reason to read the doctrine of workproduct protection into the statute in order to determine the scope of the mediation privilege, which they contend is absolute: Documents and other materials prepared for purposes of a mediation are protected from discovery. (See Foxgate Homeowners' Assn. v. Bramalea California, Inc. (2001) 26 Cal.4th 1, 13, 108 Cal.Rptr.2d 642, 25 P.3d 1117.) Because the materials in question were never admissible or subject to discovery outside of the litigation, the materials do not fall within the statutory exception of section 1120. Lastly, Coffin casts the issue as a fact question, and points out that the trial court conducted and determined after a fact-intensive inquiry that the materials were prepared for purposes of mediation, and we cannot overturn that finding because it is supported by substantial evidence.

I. STANDARD OF REVIEW.

The trial court's determination of a motion to compel discovery is reviewed under the abuse of discretion standard. (BP Alaska Exploration, Inc. v. Superior Court (1988) 199 Cal.App.3d 1240, 1261, 245 Cal.Rptr. 682.) However, at the outset, we must determine whether the court applied the correct legal standard to the issue in exercising its discretion, which determination is a question of law for this court. "Of course, `[t]he scope of discretion always resides in the particular law being applied; action that transgresses the confines of the applicable principles of law is outside the scope of discretion....'" (People v. Parmar (2001) 86 Cal.App.4th 781, 793, 104 Cal.Rptr.2d 31.) Because our analysis of the issue involves the interpretation of a statute, we review the trial court's ruling under Evidence Code sections 1119 and 1120 de novo. (Sutco Construction Co. v. Modesto High School Dist. (1989) 208 Cal.App.3d 1220, 1228, 256 Cal. Rptr. 671.)

II. SECTIONS 1119 AND 1120 DO NOT PROTECT RAW EVIDENCE.

A. Sections 1119 and 1120 Are Clear and Unambiguous.

Evidence Code section 1119 provides a non-disclosure privilege for certain communications made during mediation. In particular, and relevant to the materials sought in the instant case, Evidence Code section 1119 provides that "[n]o writing, as defined in Section 250, that is prepared for the purpose of, in the course of, or pursuant to, a mediation or a mediation consultation, is admissible or subject to discovery, ..."[8] Writings are defined broadly in *105 Evidence Code section 250,[9] and include photographs, videos, and tape recordings. (See, e.g., Jones v. City of Los Angeles (1993) 20 Cal.App.4th 436, 442-43, 24 Cal. Rptr.2d 528.) In construing sections 1119 and 1120, we are guided by well established principles of statutory construction.
The primary goal of statutory interpretation is to effectuate the legislature's intent in enacting the statute. Generally, statutory interpretation involves a multi step process. We first turn to the words of the statute. (In re Littlefield (1993) 5 Cal.4th 122, 130, 19 Cal.Rptr.2d 248, 851 P.2d 42.) If the meaning of the words is not clear, then we turn to legislative history. Lastly, and only if we are unable to ascertain the statute's meaning, we apply reason, practicality, and common sense to the language at hand. The language of the statute must be interpreted to make it workable and reasonable. (Halbert's Lumber, Inc. v. Lucky Stores, Inc. (1992) 6 Cal.App.4th 1233, 1238-1240, 8 Cal.Rptr.2d 298.)
If, however, the meaning of the statute's words is unambiguous, then the language of the statute controls, and we need not resort to other construction aids. (Halbert's Lumber, Inc. v. Lucky Stores, Inc., supra, at p. 1240, 8 Cal.Rptr.2d 298; Lungren v. Deukmejian (1988) 45 Cal.3d 727, 735, 248 Cal.Rptr. 115, 755 P.2d 299.) A statute is ambiguous only where it is susceptible of two reasonable constructions. In such case, we will resort to a variety of extrinsic aids, including the ostensible objectives of the statute, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme. (Wilcox v. Birtwhistle (1999) 21 Cal.4th 973, 977, 90 Cal.Rptr.2d 260, 987 P.2d 727.)
In reading the statute, we will not alter or amend the language of the statute to accomplish a purpose that does not appear to comport with the legislative purpose. (People v. Knowles (1950) 35 Cal.2d 175, 183, 217 P.2d 1.) We give the words their ordinary, everyday meaning, unless the statute specifically defines those words. (Wilcox v. Birtwhistle, supra, 21 Cal.4th at p. 977, 90 Cal.Rptr.2d 260, 987 P.2d 727.) Further, we read the various statutes concerning the mediation privilege as a whole to give effect to all of the provisions relating to this privilege, and will not read one section to contradict another or to contradict its overall purpose. (City of Huntington Beach v. Board of Administration (1992) 4 Cal.4th 462, 468, 14 Cal.Rptr.2d 514, 841 P.2d 1034.) Specific provisions are to be given effect over more general provisions consistent with the above rules of statutory construction. (Fremont Comp. his. Co. v. Superior Court (1996) 44 Cal.App.4th 867, 873, 52 Cal.Rptr.2d 211.) Where two statutes address a common subject, we must construe them in reference to each other so as to avoid rendering any part of them surplusage. (DeVita v. County of Napa (1995) 9 Cal.4th 763, 778, 38 Cal.Rptr.2d 699, 889 *106 P.2d 1019.) We must presume the Legislature intended "every word, phrase, and provision ... to have meaning and to perform a useful function." (Clements v. T.R. Bechtel Co. (1954) 43 Cal.2d 227, 233, 273 P.2d 5.) Lastly, nothing in the rules above prevents us from determining whether a statute is internally consistent or whether the literal meaning of the statute is consistent with its legislative purpose. (People v. Brewer (2001) 87 Cal.App.4th 1298, 1303-1304,105 Cal.Rptr.2d 293.)
Fortunately, our Supreme Court has spoken on the legislative purpose behind the mediation privilege, which is to encourage mediation by providing for confidentiality of documents introduced therein. (Foxgate Homeowners' Assn. v. Bramalea California, Inc., supra, 26 Cal.4th 1, 108 Cal.Rptr.2d 642, 25 P.3d 1117.) "[T]he purpose of confidentiality is to promote `a candid and informal exchange regarding events in the past.... This frank exchange is achieved only if the participants know that what is said in the mediation will not be used to their detriment through later court proceedings and other adjudicatory processes.' [Citations]." (Foxgate Homeowners' Assn. v. Bramalea California, Inc., supra, at p. 14, 108 Cal.Rptr.2d 642, 25 P.3d 1117.) Mediation is the preferred method for dealing with many disputes because it conserves resources and avoids subjecting the parties to "`unnecessarily costly, time-consuming, and complex' " court proceedings. The Supreme Court has stressed that "confidentiality is essential to effective mediation," (ibid) and therefore, "the statutory scheme ... unqualifiedly bars disclosure of communications made during mediation absent an express statutory exception." (Id. at p. 15, 108 Cal.Rptr.2d 642, 25 P.3d 1117.) Section 1120 is just such a statutory exception. Section 1120 provides that evidence which is otherwise admissible is not protected simply because it was introduced or used during a mediation.[10]
Construing these statutes, we conclude that the language of sections 1119 and 1120 is clear and unambiguous and that the plain language of the statute's privilege from disclosure does not apply to "evidence." Rather, sections 1119 and 1120 are meant to protect the substance of mediation, i.e., the negotiations, communications, admissions, and discussions designed to reach a resolution of the dispute at hand. These statutes do not protect pure evidence.
First, Evidence Code section 140 defines "evidence" as "testimony, writings, material objects, or other things presented to the senses that are offered to prove the existence or nonexistence of a fact." Section 140 thus covers both oral statements, written statements, and physical evidence. On the other hand, Section 1119 breaks the "evidence" of section 140 into two groups: it protects "evidence" of "anything said" or "admission made," which are oral or written statements, in tangible or intangible form. Section 1119 also protects "writings," which are "defined very broadly to include all forms of tangible expression, including pictures and sound recordings." (7 Cal.L.Rev.Comm. Reports 1 (1965).) Nowhere does section 1119 say it protects hard evidence, i.e., what section 140 defines as "material objects, or other things presented to the senses that are offered to prove the existence or nonexistence of a fact." If the statute were meant to protect all evidence, including raw evidence, section *107 1119 would not specifically define the particularized types of evidence (oral and written) it does protect. Section 1119 reiterates that "[a]U communications, negotiations, or settlement discussions" occurring during the mediation shall remain confidential. Thus, the language of section 1119 read alone supports the conclusion that it does not protect raw evidence, but only protects statements and writings.
Furthermore, turning to section 1120, it provides that "[e]vidence otherwise admissible (italics added) or subject to discovery outside of a mediation ... shall not be or become inadmissible or protected from disclosure solely by reason of its introduction or use in a mediation or a mediation consultation." This section does not cover writings, statements, or communications; it only covers "evidence." This word choice implies that because writings, statements and communications are protected, something remains that is unprotected. That thing which is unprotected is "evidence" which is "otherwise" admissible. "Otherwise admissible" evidence therefore is relevant evidence that is otherwise not covered by the mediation privilege and not subject to exclusion under some other rule or privilege set forth in the Evidence Code. (§§ 351, 352.)
In addition, section 1120 excludes from protection evidence which is "otherwise" "subject to discovery outside of mediation." Evidence subject to discovery is very broad, and "any party may obtain discovery regarding any matter, not privileged, that is relevant to the subject matter involved in the pending action or to the determination of any motion made in that action, if the matter either is itself admissible in evidence or appears reasonably calculated to lead to the discovery of admissible evidence...." (Code Civ. Proc, § 2017, subd. (a).) Again, this language, which is broader than just merely admissible evidence, implies that the scope of the mediation privilege does not cover absolutely everything that might happen to be used during a mediation.
Section 1120 explicitly states that it does not protect from disclosure evidence "solely by reason of its introduction or use in a mediation or mediation consultation." This reinforces our interpretation that mediation confidentiality is meant to protect the substance of the negotiations and communications in furtherance of the mediation, not the factual basis of those negotiations. Thus, even if evidence is used or introduced in the mediation, it is not protected.
Lastly, we point out our interpretation is not changed by the fact section 1120 itself provides for specific, enumerated exceptions to disclosure. These include agreements to mediate, agreements concerning defaults or the time within which actions must be taken in a civil proceeding, and the fact a mediator has served, is serving, will serve, or was contacted about serving in a mediation. (§ 1120, subd. (b).) The enumeration of these particular items does not operate to limit the scope of the statute to them exclusively; rather, because section 1120 refers to "evidence" and such items are "writings" within the meaning of section 250 and therefore privileged pursuant to section 1119, this portion of section 1120 further expands its scope, rather than restricting it.
In summary, we therefore reject Coffin's reading of sections 1119 and 1120 that all materials introduced at the mediation, or prepared for the mediation, including those of a purely evidentiary nature, are encompassed within the scope of the privilege because they were "prepared for the purpose of, in the course of, or pursuant to," the mediation. Such a reading would render section 1120 complete surplusage and foster the evils it is designed to prevent: *108 namely, using mediation as a shield for otherwise admissible evidence. If we were to read sections 1119 in this fashion, in isolation, without reference to section 1120, parties such as the petitioners in the instant case would have no access to necessary and relevant factual materials with which to conduct their litigation. Indeed, as stated in the Law Revision Commission comments, section 1120 is designed to prevent materials from being introduced in mediation solely to protect them from later discovery or use in litigation. (See Cal. Law Rev. Com. com. 29B, pt. 3, West's Ann. Evid. Code (2002 Supp.) Foil. § 1120, p. 98 [section 1120 "limits the scope of Section 1119 ... preventing parties from using a mediation as a pretext to shield materials from disclosure"].) Both sections 1119 and 1120 make clear that the Legislature intended to place some restrictions on the otherwise broadly stated mediation privilege.

B. Work Product Doctrine Guides the Actual Admissibility Determination.

1. The Work-Product Doctrine.
If "evidence" is not protected, then what guidance may the court use to determine the scope of "evidence" protected? Under the work product doctrine, courts routinely have dealt with the distinction between unprotected factual material and protected mental processes. In California, work product is protected by statute[11] and defined by case law as "`the product of [the attorney's] effort, research, and thought in the preparation of his client's case. It includes the results of his own work, and the work of those employed by him or for him by his client, in investigating both the favorable and unfavorable aspects of the case, the information thus assembled, and the legal theories and plan of strategy developed by the attorneyall as reflected in interviews, statements, memoranda, correspondence, briefs, and any other writings reflecting the attorney's "impressions, conclusions, opinions, or legal research or theories," and in countless other tangible and intangible ways.'" (BP Alaska Exploration, Inc. v. Superior Court, supra, 199 Cal.App.3d at pp. 1253-1254, fn. 4, 245 Cal.Rptr. 682.) California recognizes that the work-product doctrine "prevents attorneys from taking undue advantage of their adversary's industry and efforts." (Code Civ. Proc, § 2018, subd. (a).)
In California, the distinction between "derivative" and "non-derivative" material is the analytic framework applied to determining whether materials are protected by the attorney work-product doctrine. Three levels of protection exist. Core work product, i.e., material solely reflecting an attorney's "`impressions, conclusions, opinions, or legal research or theories,' " is entitled to absolute protection from discovery. (Izazaga v. Superior Court (1991) 54 Cal.3d 356, 382, fn. 19, 285 Cal.Rptr. 231, 815 P.2d 304.) Qualified protection exists for work product which is an amalgamation of factual information and attorney thoughts, impressions, conclusions. (Nacht & Lewis Architects, Inc. *109 v. Superior Court (1996) 47 Cal.App.4th 214, 217, 54 Cal.Rptr.2d 575.) Such derivative material would include charts and diagrams, audit reports, compilations of entries in documents, records and other databases, appraisals, opinions, and reports of experts employed as non-testifying consultants. Derivative work product will be ordered disclosed if denial of discovery would unfairly prejudice the other party or result in an injustice. (Code Civ. Proc, § 2018, subd. (b); BP Alaska Exploration, Inc. v. Superior Court, supra, 199 Cal.App.3d at p. 1250, 245 Cal.Rptr. 682.) The party seeking disclosure must demonstrate good cause, which involves a balancing of the need for disclosure against the purposes served by the work-product doctrine. (National Steel Products Co. v. Superior Court (1985) 164 Cal. App.3d 476, 490, 210 Cal.Rptr. 535.) Lastly, purely factual material receives no work product protection. (Nacht & Lewis Architects, Inc. v. Superior Court, supra, at pp. 217-218, 54 Cal.Rptr.2d 575; Rodriguez v. McDonnell Douglas Corp. (1978) 87 Cal.App.3d 626, 647-648, 151 Cal.Rptr. 399.)
The mere fact that a lot of "work" has been put into preparing the materials does not entitle them to work-product protection. Thus, a list of witnesses showing their names and locations is not protected, even where the attorney has spent a lot of time investigating and compiling the list. (Aerojet-General Corp. v. Transport Indemnity Insurance. (1993) 18 Cal.App.4th 996, 1004, 22 Cal.Rptr.2d 862.) However, where the list of witnesses contains "tactical information" because it is a list of potential witnesses, it becomes work product. Such a list "would tend to reveal counsel's evaluation of the case by identifying the persons who claimed knowledge of the incident from whom counsel deemed it important to obtain statements." (Nacht & Lewis Architects, Inc. v. Superior Court, supra, 47 Cal. App.4th at p. 217, 54 Cal.Rptr.2d 575.) The value of the list would be in those persons excluded and those persons included, even thought ostensibly the list itself was purely "factual" information.
The dissent, on the other hand, finds the mediation privilege absolute, pointing to the purpose of mediation, which is to encourage the resolution of disputes. However, were we to find all material introduced into a mediation covered by the privilege, this would (1) render the language of section 1120 nugatory, and (2) permit the parties to use mediation as a shield to hide evidence. We hardly think this was the Legislature's purpose in providing for the express language of section 1120. Most lawsuits are factual disputes, rather than legal ones, which is the reason discovery is often such a difficult and protracted process full of gamesmanship. To give the parties one more avenue where they could hide evidence and obstruct the fact-finding process of litigation would be, in our view, disastrous and would not foster resolution of disputes, but hinder them. Parties could simply agree to mediate, introduce all their evidence, and then refuse to settle, and claim privilege. What then? There is no mechanism in the mediation statutes to deal with this inevitable result, as there is with discovery. We think the distinction between derivative and non-derivative material accommodates the Legislature's intent in enacting section 1120, and balances the need for confidentiality (statements and communications are still protected) with the need to keep pure evidence from being dishonestly hidden through the pretext of being introduced into a mediation.[12]

*110 2. Mediation Privilege Protection Is Co-Extensive with The Work Product Doctrine.

Given that the framework of discoverable materials under the work-product doctrine closely mirrors the express statutory privilege exception of section 1120, which applies to "evidence otherwise admissible" or items "subject to discovery outside of a mediation," we read it to protect materials in same manner as the work-product doctrine. However, in order to effectuate the purposes of the mediation privilege, with respect to derivative materials, they are discoverable only upon a showing of good cause, which requires a determination of the need for the materials balanced against the benefit to the mediation privilege obtained by protecting those materials from disclosure. Because petitioners were not parties to the underlying litigation and were not joined as parties to that litigation, they do not have access to much material that has been removed or destroyed.
Applying this framework to the instant case, we find that non-derivative material, such as raw test data, photographs, and witness statements, are not protected by section 1119. To the extent any of the materials sought are part of a "compilation" prepared for the mediation or put together in such a manner that it discloses the attorneys' or parties' evaluations of the strengths and weaknesses of the case or discloses their negotiation posture, if it can be reasonably detached from the compilation, it must be produced. Thus, photographs in a book labeled "defects" would be removed from the book and given to petitioners singly. If the photographs contain arrows or captions, such arrows or captions may be removed. We point out photographs are not protected simply because no pictures were taken of unblemished or non-defective portions of the Apartment Complex, and mold and air samples are not protected merely because samples may have only been taken inside the Apartment Complex or in areas where construction defects were located. It is axiomatic that most, if not all, of the pictures would depict defects in the instant case; it is also inescapable that mold and air sampling would have more likely been done in damaged units. Conversely, test data that is in a chart that in any fashion indicates the attorneys' or parties' evaluation of the case or their negotiation posture, it is protected. However, to the extent such test data may be extrapolated from the chart and given to petitioners, it must be produced. Such determinations shall be made by the trial court after a careful in camera review of the materials.
Lastly, petitioners have no other means of obtaining this information due to the fact they were not joined in the prior lawsuit and because the remediation efforts undertaken by Coffin and the Developers have eliminated most, if not all, of the relevant evidence. Therefore, in certain instances, it may be appropriate that they be given amalgamated materials if such materials cannot easily be broken into their protected and non-protected components. Such a determination must be made in the trial court after a careful in camera inspection of the material sought.

DISPOSITION
Let a peremptory writ of mandate issue in the first instance directing the respondent superior court to vacate its order of *111 March 7, 2002. Consistent with the views expressed in this opinion, the trial court is directed to conduct an in camera review of all materials falling within petitioners' document production requests to determine which materials are protected by the mediation privilege and those which are not so protected.
I concur: JOHNSON, J.
PERLUSS, J., Dissenting.
To encourage use of mediation as an alternative to a judicial determination of a dispute, the California Law Revision Commission in 1985 recommended enactment of former Evidence Code section 1152.5 [1] to protect "statements made and documents prepared in the course of a mediation" from "disclosure in latter judicial proceedings." (Recommendation Relating to Protection of Mediation Communications (Jan.1985) 18 Cal. Law Revision Com. Rep. (1986) App. III, p. 243.)[2] The Legislature, through subsequent amendments to former section 1152.5 and adoption of section 1119, which replaced former section 1152.5, has extended and reinforced the mediation privilege, recognizing that "confidentiality is essential to effective mediation ...." (Foxgate Homeowners' Assn. v. Bramalea California, Inc. (2001) 26 Cal.4th 1, 14, 108 Cal.Rptr.2d 642, 25 P.3d 1117.)
Divining a distinction between "derivative" and "non-derivative" materials nowhere found in the statutory scheme and acknowledging only a qualified protection from disclosure even for concededly privileged materials, the majority has now effectively eradicated any significance from the mediation privilege in California. Because I believe the limited and "qualified" protection fashioned by the majority for materials prepared for mediation is inconsistent with the language and the legislative intent underlying section 1119, I respectfully dissent.
Section 1119, subdivision (b), protects from disclosure all "writings," as defined by section 250, "prepared for the purpose of, in the course of, or pursuant to, a mediation." I agree with the majority that the language of this section is clear: Absent an express statutory exception "as provided in this chapter," section 1119 affords absolute confidentiality to writings prepared for a mediation, whether or not the document or other writing is actually used in the mediation itself and whether or not the document is "purely evidentiary" in nature. There is no room in this provision for judicially created limitations. (Foxgate Homeowners' Assn. v. Bramalea California, Inc., supra, 26 Cal.4th at p. 4, 108 Cal.Rptr.2d 642, 25 P.3d 1117.)
To be sure, pursuant to section 1120, evidence otherwise discoverable outside of a mediation does not gain protection from disclosure "solely by reason of its introduction or use in a mediation ...." (§ 1120, subd. (a), italics added.) Section 1120 is thus a statutory limitation on the "in the *112 course of prong of section 1119; but, by its plain language, this section does not restrict the scope of the privilege when applied to communications or writings "prepared for the purpose of a mediation.[3]
Read together, therefore, sections 1119 and 1120 preclude compelled discovery of any writing (including witness statements, photographs and test results) that was, in fact, prepared for use in a mediation. Even if such material can properly be described as "raw material" or "purely evidentiary," it is confidential and protected from disclosure, not because it was used during a mediation, but because it was "prepared for" the mediation, the touchstone for application of the privilege contained in section 1119. Physical objects that exist independently of the mediation (spore or mold samples, for example, or a broken window pane), in contrast, are discoverable even if used at a mediation because, quite apart from the exception contained in section 1120, they are not statements made or writings prepared for the purpose of mediation within the meaning of section 1119.
I believe the majority errs not only in limiting the scope of the mediation privilege to so-called "derivative" material, but also by recognizing a "qualified" protection for those items it concedes are privileged. The majority would allow discovery of confidential material prepared for a mediation on a showing of "good cause," which requires "a determination of the need for the materials balanced against the benefit to the mediation privilege obtained by protecting those materials from disclosure." Yet the Legislature itself balanced those competing interests and concluded that, except as specifically provided by statute, the confidentiality provisions for mediation proceedings are absolute. (Foxgate Homeowners' Assn. v. Bramalea California, Inc., supra, 26 Cal.4th at p. 4, 108 Cal.Rptr.2d 642, 25 P.3d 1117.) "To carry out the purpose of encouraging mediation by ensuring confidentiality, the statutory scheme, which includes sections 703.5, 1119, and 1121, unqualifiedly bars disclosure of communications made during mediation absent an express statutory exception." (Id. at p. 15, 108 Cal.Rptr.2d 642, 25 P.3d 1117.)
Section 1122 is one such statutory exception. Examination of that provision, I believe, underscores the error in this second aspect of the majority's holding. Section 1122 provides, in part, that a communication made or writing prepared for the purpose of a mediation is neither inadmissible nor protected from discovery only if (a) all participants in the mediation agree, or (b) those participants on whose behalf the communication was made or the writing prepared agree to its disclosure and the communication or writing does not disclose anything said or done in the course of the mediation. (§ 1122, subd. (a).)[4]
*113 Stated differently, under section 1122, absent express agreement from all parties to the mediation, any writing that discloses anything done in the course of the mediation is inadmissible in a subsequent proceeding and absolutely protected from discovery however great one party's need for those materials may be. Similarly, even if it does not reveal anything said or done during the mediation itself, under section 1122 any writing protected by the mediation privilege is inadmissible and absolutely protected from disclosure unless all parties on whose behalf it was prepared agree, again regardless of another party's need for those materials. The majority's willingness to compel disclosure of mediation materials over the objection of the parties upon a sufficient showing of need is inconsistent with this narrowly drawn exception to the otherwise absolute protection created by section 1119.
I would affirm the order of the trial court denying petitioners' request to compel production and inspection of documents.
NOTES
[1] In connection with the mediation, Coffin prepared an "investigation binder" containing hundreds of photographs of the Apartment Complex and other data taken from the premises. This binder was offered to the other parties participating in the mediation for $60 to cover the copying costs.
[2] The Second Combined Amended Complaint alleged 10 causes of action for negligent maintenance of premises, breach of the warranty of habitability (contract, tort, and statutory), concealment, breach of the covenant of quiet enjoyment, nuisance, strict liability, negligence, and intentional infliction of emotional distress.
[3] Upon motion of Coffin to this court, we ordered the sealed transcript lodged with this court under seal. Petitioners have moved for access to the sealed transcript, or in the alternative, to unseal the transcript or unseal portions of the transcript. As discussed infra, the trial court applied the incorrect legal standard to petitioners' discovery request; therefore, whether it abused its discretion or erred in relying on the court's statements at the first document production hearing has no bearing on our determination of those issues. Because the transcript is not relevant to the determination of the issues on appeal and contains discussions concerning privileged material, we deny the motion without prejudice to later renewal in the trial court.
[4] The court took under submission the matter as to other defendants, conducted an in camera review on January 30, 2001, and issued a similar ruling on February 6, 2001.
[5] Briefing on the motion consisted of the motion, an opposition, a reply, a sur-reply, and a reply to the sur-reply.
[6] All references herein, unless otherwise noted, are to the Evidence Code.
[7] Coffin is joined by Deco Construction Corporation. Haven Mechanical and GES Roofing filed separate answers.
[8] Section 1119 provides in full that: "Except as otherwise provided in this chapter: [¶] (a) No evidence of anything said or any admission made for the purpose of, in the course of, or pursuant to, a mediation or a mediation consultation is admissible or subject to discovery, and disclosure of the evidence shall not be compelled, in any arbitration, administrative adjudication, civil action, or other noncriminal proceeding in which, pursuant to law, testimony can be compelled to be given. [¶] (b) No writing, as defined in Section 250, that is prepared for the purpose of, in the course of, or pursuant to, a mediation or a mediation consultation, is admissible or subject to discovery, and disclosure of the writing shall not be compelled, in any arbitration, administrative adjudication, civil action, or other noncriminal proceeding in which, pursuant to law, testimony can be compelled to be given. [¶] (c) All communications, negotiations, or settlement discussions by and between participants in the course of a mediation or a mediation consultation shall remain confidential."
[9] Evidence Code section 250 provides that `[w]riting' means handwriting, typewriting, printing, photostating, photographing, and every other means of recording upon any tangible thing any form of communication or representation, including letters, words, pictures, sounds, or symbols, or combinations thereof."
[10] Evidence Code section 1120 provides in relevant part that "(a) Evidence otherwise admissible or subject to discovery outside of a mediation or a mediation consultation shall not be or become inadmissible or protected from disclosure solely by reason of its introduction or use in a mediation or a mediation consultation."
[11] Code of Civil Procedure section 2018 provides in relevant part that "(a) It is the policy of the state to: (1) preserve the rights of attorneys to prepare cases for trial with that degree of privacy necessary to encourage them to prepare their cases thoroughly and to investigate not only the favorable but the unfavorable aspects of those cases; and (2) to prevent attorneys from taking undue advantage of their adversary's industry and efforts. (b) Subject to subdivision (c), the work product of an attorney is not discoverable unless the court determines that denial of discovery will unfairly prejudice the party seeking discovery in preparing that party's claim or defense or will result in an injustice. [H] (c) Any writing that reflects an attorney's impressions, conclusions, opinions, or legal research or theories shall not be discoverable under any circumstances."
[12] Section 1122, upon which the dissent also relies, hardly addresses the issue. What if the parties do not agree to permit evidence or other communications, writings, or statements to be used in subsequent proceedings or discovery? Simply because they may agree does not solve the problem of mediation being used to hide evidence, nor does it address the mandate of section 1120's express language.
[1] All further statutory references are to the Evidence Code unless otherwise specified.
[2] The Commission explained, "Successful mediation of disputes is one way to reduce court congestion and to avoid the cost of litigation. The Commission has considered whether legislation is needed to make mediation a more useful alternative to a court or jury trial. The Commission has concluded that legislation is needed to protect information disclosed in a mediation from later disclosure in a judicial proceeding.... [¶] The Commission recommends that a new section be added to the Evidence Code to protect oral and written information disclosed in the course of a mediation from later disclosure in a civil action or proceeding." (Recommendation Relating to Protection of Mediation Communications (Jan.1985) 18 Cal. Law Revision Com. Rep., supra, App. III, p. 245.)
[3] As enacted, former section 1152.5 protected statements or admissions "made in the course of the mediation" (former § 1152.5, subd. (a)(1); Stats. 1985, ch. 731, § 1, p. 2379) and documents "prepared for the purpose of, or in the course of, or pursuant to, the mediation." (Former § 1152.5, subd. (a)(2); Stats 1985, ch. 731, § 1, p. 2379.) When this provision was repealed in 1997 and replaced by section 1119, the Legislature extended the protection for oral communications to include those "made for the purpose of or pursuant to a mediation, not just oral communications made in the course of the mediation." (Cal. Law Revision Com. com., reprinted at 29B pt. 3 West's Ann. Evid.Code (2002 supp.) foil. § 1119, p. 95.)
[4] Section 1122 provides in full: "(a) A communication or a writing, as defined in Section 250, that is made or prepared for the purpose of, or in the course of, or pursuant to, a mediation or a mediation consultation, is not made inadmissible, or protected from disclosure by provisions of this chapter if either of the following conditions is satisfied: [¶] (1) All persons who conduct or otherwise participate in the mediation expressly agree in writing, or orally in accordance with Section 1118, to disclosure of the communication, document, or writing. [¶] (2) The communication, document, or writing was prepared by or on behalf of fewer than all the mediation participants, those participants expressly agree in writing, or orally in accordance with Section 1118, to its disclosure, and the communication, document, or writing does not disclose anything said or done or any admission made in the course of the mediation. [¶] (b) For purposes of subdivision (a), if the neutral person who conducts a mediation expressly agrees to disclosure, that agreement also binds any other person described in subdivision (b) of Section 1115."